Filed 9/14/21  In re G.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re G.S. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v. G.S., Defendant and Appellant. | F082363 (Super. Ct. Nos. 20CEJ300210-3, 20CEJ300210-4, 20CEJ300210-5, 20CEJ300210-6) **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Gary L. Green, Commissioner.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Gregory, Gian, Alayasia, Maliyah, and Giana were removed from their mother's custody. After the children's removal, noncustodial parent Gregory S. (father) requested placement of Gregory, Gian, Alayasia, and Maliyah. The juvenile court denied his request for placement, finding the children would suffer detriment if placed in his care under Welfare and Institutions Code section 361.2, subdivision (a).[1] Father appeals the dispositional order denying him placement, arguing there was insufficient evidence to support the juvenile court's detriment finding. We affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL SUMMARY

### *Section 300 Petition and Detention*

On July 30, 2020,[2] the Fresno County Department of Social Services (the department) filed a petition on behalf of Gregory, Gian, Alayasia, Maliyah, Giana, and their two half siblings, alleging they came within the juvenile court's jurisdiction under section 300, subdivisions (a), (b)(1), and (c). The children were between 10 years old and three months old. The petition alleged the children were at risk of serious physical harm and serious emotional damage due to mother's alcohol abuse and ongoing domestic violence with the children's older half sibling, Taylor. The petition alleged that mother engaged in a physical altercation with Taylor while intoxicated. Mother told the responding law enforcement officers that if they left the children in her care, she would "'beat the shit out of them.'" The children were detained and placed in foster care, except for Giana who was placed in a relative's home. The petition indicated father was homeless.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     The date stamped on the petition was July 30, 2020; however, the minute orders dated August 4, 2020, and August 5, 2020, indicate the petition was filed on July 31, 2020. Additionally, the juvenile court stated the petition was filed on July 31, 2020, at the combined jurisdictional/dispositional hearing.

At a team decision-making meeting conducted on July 31, 2020, father stated eight-year-old Gian and seven-year-old Alayasia should not have been removed because they were on his public assistance case in Los Angeles County and were only visiting mother.[3] He said he and the two children were receiving homeless assistance and he was meeting all their needs. He stated he "did not need to or want anyone knowing his business or assisting him." He urged he "was stable, had employment, and his kids needed to be in his care because he was the safe parent."

The department's detention report dated August 3, 2020, recommended the children be removed from mother's care due to her substance abuse problem and her ongoing domestic violence issues with Taylor. Additionally, the department recommended against placing the children in father's care because he was homeless.

At the initial petition hearing on August 5, 2020, father requested the children be placed in his care. He also requested a paternity test for Giana, which the court ordered. The juvenile court found that returning the children to mother's care was contrary to the children's welfare and detained them. Father was given supervised visitation with the children. Additionally, the court ordered services for both mother and father, including parenting classes, substance abuse assessments and treatment, random drug testing, and domestic violence assessments and treatment.

*Jurisdiction and Disposition*

**Jurisdictional/Dispositional Report**

The department's jurisdictional/dispositional report dated September 18, 2020, stated father had not been compliant with services and had not contacted the department to set up visitation; furthermore, his whereabouts were unknown. According to the report, a social worker made telephone contact with father one time in September 2020,

---

[3] Despite father's contention that Gian and Alayasia lived with him and were only visiting mother, Alayasia reported that she did not live with father and only visited him.

but father stated he was working and was unable to talk. The social worker provided father with contact information and informed him of the importance of calling back. The social worker attempted to reach father a second time that month to confirm his mailing address, but was unsuccessful.

The report also contained information regarding father's criminal history. Amongst other convictions, father had three drug-related felony convictions and two domestic violence felony convictions.

At the time, the department considered father to be an alleged father of Gregory, Maliyah, and Giana, and a presumed father of Gian and Alayasia. As to Gregory, Maliyah, and Giana, the department recommended father not be offered reunification services because he was considered an alleged father. As to Gian and Alayasia, the department recommended against placing them in father's care and recommended father not be offered reunification services.

**Jurisdictional/Dispositional Hearing**

At the combined jurisdictional/dispositional hearing on September 22, 2020, the juvenile court found the children were described by section 300, subdivisions (a), (b), and (c). Father requested a contested hearing regarding the department's recommendation not to place the children with him and asked to be assessed for placement. The juvenile court set a contested dispositional hearing for October 29, 2020.

On October 13, 2020, father filed a statement regarding parentage (Judicial Council Form, form JV-505 (JV-505 form)), indicating he believed he was Maliyah's father.[4] He stated he "was in Maliyah's life acting as her father from day one" and lived with her until 2018 when he moved out of the family home.

---

**4** Although father only listed Maliyah on the JV-505 form, the department's October addendum report stated that father filed the JV-505 form on behalf of Gregory, Maliyah, and Giana.

**October Addendum Report**

On October 23, 2020, the department submitted an addendum report stating that in October 2020 mother was on a supervised call with Gian and father when father became verbally abusive and called mother a "'bitch.'" The care provider intervened and became concerned when Gian stated that father always spoke in that manner. Gian said he did not want to have any further communication with father.

The report indicated the department had attempted to contact father by telephone a total of five times in September and October, but was unsuccessful. Additionally, the department sent him a letter notifying him to contact the department.

The department recommended father be denied elevation to presumed father status of Gregory, Maliyah, and Giana, and be denied reunification services. The report noted that although father requested placement at the September 22, 2020 hearing, he had not contacted the department to inquire about placement or services.

**December Addendum Report**

On December 8, 2020, the department submitted a second addendum report stating that on November 19, 2020, the department finally made telephone contact with father. The social worker explained the purpose of the call, but father became upset. He asked if the social worker was the person he had repeatedly asked to stop calling, and said he was in "the middle of suing the person who keeps calling." He stated he did not understand why he did not have his children. The social worker had to ask father to stop yelling and father replied, "'then stop calling my phone bitch,'" and ended the call.

On November 24, 2020, the department made telephone contact with father again. He immediately became upset and stated he did not understand why his children were removed from mother's care since her problems only involved Taylor. Father stated he obtained stable housing and should have all his children under his care. The social worker explained that she had been having a difficult time contacting him. Father said he did not need the social worker's help and would be taking care of the situation himself in

court. The social worker explained that she was trying to assess him for placement and services, but father repeated that he did not need her help and ended the call.

On November 25, 2020, a social worker attempted to speak to Gian about father, but he refused to speak. Gian's care provider stated he appeared to regress and act out whenever father was mentioned.

On December 7, 2020, the department made telephone contact with father again. Father stated he wanted placement of all five children, pending the results of Giana's paternity test. However, he was unsure whether he wanted services since he was the nonoffending parent and wanted to speak with his attorney first. At that point, father agreed to maintain contact with the department.

The department again recommended the children not be placed in father's care and father be denied reunification services on the basis that he had not maintained consistent contact with the department, was verbally aggressive during phone calls, was unwilling to state his ability to provide adequate care for the children, and was unwilling to participate in court-ordered services. The department further recommended he be denied elevation to presumed father status of Gregory, Maliyah, and Giana.

**January Addendum Report**

On January 6, 2021, the department submitted a third addendum report containing information that on December 8, 2020, father acknowledged that Gregory, Gian, Alayasia, and Maliyah are his children and wanted them in his care full-time. He said he wanted to begin visitation on a regular basis; however, he was unsure if Giana was his child and he wanted a paternity test.

Additionally, on December 29, 2020, father spoke to a social worker and reported that Gian and Alayasia resided in his care and attended school in Los Angeles until COVID-19, at which time they stopped going to school because he did not have stable housing and was unable to provide the school with a physical address. He said he worked full-time, had a babysitter, and was able to provide for them.

On December 30, 2020, the visitation coordinator notified the assigned social worker that father was scheduled to begin visitation on January 11, 2021, but the social worker had been unable to make contact with father to confirm.

On January 5, 2021, the department made successful telephone contact with father to speak about Gian. The social worker asked father to explain his relationship with Gian and father explained, "Gian is his own person, and is a 'Mama's Boy.'" Father was aware Gian wanted to live with mother, but said mother previously sent Gian to live with him due to his "out of control behaviors." The social worker also inquired about father's ability to provide a safe, stable home for the children. Father answered questions vaguely, and frequently became agitated. He reported he had a job, "a sitter, a place to live, and a clean background." Father refused to provide any further information. When the social worker explained the importance of having a positive relationship with him, father became agitated and stated he did not need help from anyone and would "get his children on his own." Father eventually calmed down and said he would communicate and participate in reunification services if they were offered.

As to Gian, the report indicated he did not want to live with his father, but was willing to participate in visits.

The department recommended father be elevated to presumed father status of Gregory, Maliyah, and Giana, and be offered reunification services.

On January 7, 2021, father was present at the scheduled disposition hearing via video conference, but abruptly left when he heard that the hearing was being continued. Father's counsel requested the department assess father's home and offer him reunification services. Counsel for the department noted that father was offered services on August 5, 2020, at the detention hearing, but father had not engaged in services and had not been cooperative. Moreover, she stated Alayasia gave father her care provider's address and father threatened to take her from the home. The juvenile court ordered father's counsel to instruct father not to engage in that type of behavior. Father's counsel

noted that father believed there was an issue with physical discipline in the foster home. Additionally, counsel for the department asked to amend the petition to elevate father to presumed status of all the children except Giana. She clarified that father was not requesting to be elevated to presumed father of Giana. The juvenile court continued the disposition hearing to January 12, 2021.

At the continued hearing on January 12, 2021, father requested placement of Gregory, Gian, Alayasia, and Maliyah. The department was not in agreement with father's request. Father noted that he had already provided the department with his home address, but his home had not been assessed for placement. He said he lived with his mother, who was frequently home. A contested dispositional hearing was set for January 15, 2020.

### *Final Dispositional Hearing*

At the contested dispositional hearing on January 15, 2021, father was elevated to presumed father status of Gregory and Maliyah. As previously noted, he was already considered the presumed father of Gian and Alayasia. Father continued to seek placement of the four children in his home. The department recommended reunification services for father, but not placement.

#### Social Worker Palacioz's Testimony

Social worker Meredith Palacioz testified she repeatedly attempted to contact father in September and October 2020, but he never returned any of her calls or text messages. She said she also sent him a letter in October 2020 informing him of the importance of speaking with him. Palacioz finally reached him in November 2020, but father called her a "bitch" and hung up.

Palacioz stated another social worker contacted social services in Los Angeles County to ask if Gian and Alayasia were on father's public assistance case and was informed father was not on public assistance, but "home assistance." As a result, the social worker did not proceed with placement of the children in father's home since

8.

"there was no home." Father provided a home address on December 29, 2020, and said he was willing to participate in services; however, the department did not assess his home for placement at that time because it was not recommending placing the children in his home due to concerns of potential drug use and domestic violence. Father had reported he smoked marijuana, and Alayasia had witnessed father smoke with his friends. According to Alayasia's care provider, Alayasia was able to identify a blunt, knew how to roll it, and knew what went inside of it. Additionally, Palacioz stated father had a "lengthy history with possession of cocaine and narcotics for sale." Father was not asked to drug test since he stated "he would not be doing any of that stuff because he was not the reason why the children were removed." Palacioz did not include the information Alayasia provided about father's drug use in any of the department's reports, but did include father's criminal drug history.

According to Palacioz, a foster care social worker informed her that as Gian was approaching a scheduled visit with father on January 11, 2020, Gian appeared extremely anxious and stated he did not want to visit him. He said he did not want to go to Los Angeles to visit anyone or to live there.

**Paternal Grandmother's Testimony**

Grandmother Cynthia J. testified she was the children's grandmother and had an established relationship with them. She said father lived with her, and she was willing to have her home assessed for placement. She claimed she was able to provide support to father to ensure the children's needs were being met. Grandmother denied that father had ever been aggressive toward her or the children. However, she stated father would "whoop" the children sometimes and "probably" used a belt when doing so.

**Juvenile Court's Findings**

In determining whether placing the children with father would be detrimental to the children, the juvenile court took into consideration that Gian did not want to live with or visit father and, at one point, did not want to have contact with him. It also considered

father's acrimonious conversations with the social workers, his inability to maintain contact with the department, his reluctance to participate in services, and his unstable housing situation. The juvenile court expressed concern that father might not make the children available to mother if they were placed with him, or that he "could abscond with the children based on his comment at a meeting that he would be coming up to take [Alayasia]." Additionally, the juvenile court considered that father "could potentially expose the children to drug use," as evidenced by Alayasia witnessing her father "rolling" a "blunt" and father's criminal drug history. Moreover, the court had concerns about grandmother's testimony that father "whoops" the children.

Ultimately, the juvenile court found by clear and convincing evidence that placement with father would be detrimental to the safety, protection, or physical or emotional well-being of the children, and that father had made no progress toward alleviating or mitigating the causes necessitating placement of the children in foster care.

## DISCUSSION

Defendant's sole contention on appeal is that there was insufficient evidence to support the juvenile court's detriment finding. We disagree.

When "a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child …." (§ 361.2, subd. (a).) Section 361.2 "evinces [a] legislative preference for placement with the noncustodial parent when safe for the child." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262 (*Patrick S.*).)

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th

10.

1412, 1425 (*Luke M.*).) Because a detriment finding requires the court to weigh all relevant factors to determine if the child will suffer harm, no one factor is dispositive. (*Ibid.*) Factors to consider include any jurisdictional findings against the parent, any criminal history, substance abuse or mental illness, the age of the child, any special needs the child may have, the nature of the relationship between the parent and child, and the ability of the parent to meet the child's needs. (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1265; *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1505; *Luke M.*, *supra*, at pp. 1425–1427.) Additionally, the juvenile court may consider the dependent child's own wishes and the existence and quality of the child's bond with other family members. (See, e.g., *Luke M.*, *supra*, at 1427; see also *In re A.C.* (2020) 54 Cal.App.5th 38, 43; *In re C.M.* (2014) 232 Cal.App.4th 1394, 1402.)

"The juvenile court must make the detriment finding by clear and convincing evidence. [Citations.] We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that placement would be detrimental to the child. Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Patrick S.*, *supra*, 218 Cal.App.4th at p. 1262; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 (*O.B.*) [clear and convincing "'requires a finding of high probability'"].) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*O.B.*, *supra*, at p. 1005, fn. omitted; *id.* at p. 1011 ["[T]he question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."]; accord, *In re I.R.* (2021) 61 Cal.App.5th 510, 520; *In re V.L.* (2020) 54 Cal.App.5th 147, 155.) "'We do not evaluate

11.

the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The appellant has the burden of showing the finding or order is not supported by substantial evidence.'" (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.)

In this case, there was substantial evidence demonstrating that placement with father would have been detrimental to Gregory, Gian, Alayasia, and Maliyah. The juvenile court had father's criminal history before it and evidence that he exposed Alayasia to drug use, was uncooperative with the department, refused to participate in services for five months, and had unstable housing.

Father's criminal history indicated he had multiple drug-related and domestic violence felony convictions. (See *Patrick S.*, *supra*, 218 Cal.App.4th at p. 1263 [the juvenile court may consider a nonoffending parent's criminal history in assessing whether to place a dependent child with them].) Additionally, Alayasia reported she witnessed her father smoke marijuana with his friends, knew what a "blunt" was, and knew how to "roll" one. Father also reported he smoked marijuana at the time. (See *ibid.* [the juvenile court may also consider the nonoffending parent's substance abuse].) Father argues these concerns were not current; however, the department had no way of assessing if the issues were indeed current since father had failed to participate in court-ordered services, which included substance abuse and domestic violence assessments.

Moreover, there was strong evidence indicating that father had unresolved anger management issues, which was especially problematic given his history of domestic violence. For instance, during a supervised call with Gian and mother in October 2020, father became verbally abusive toward mother and called her a "'bitch.'" Gian informed the care provider that father always spoke in that manner. As a result of this incident, Gian no longer wanted to communicate with father. This was not the only time father

presented as verbally aggressive.  In November 2020, father also called social worker Palacioz a "bitch" during a call and hung up on her.  Overall, father consistently was aggressive and hostile when communicating with others.  At one point, he threatened to go to Alayasia's care provider's home and take her.

Additionally, father failed to engage in services, including visitation with the children.  He did not express any willingness to participate in services until December 29, 2020.  By then, five months had passed since the children's removal.  For the most part, father was uncooperative and unresponsive to social workers, urging that he did not need or want their help.  As recently as two weeks prior to the final disposition hearing, father told a social worker that he did not need anyone's help and would "get his children on his own."  (See *In re Liam L.*, *supra*, 240 Cal.App.4th at p. 1087 [the juvenile court may also consider the noncustodial parent's cooperation with the agency in determining whether placement with the noncustodial parent would be detrimental].)

There were also issues related to Gian.  Although Gian indicated he was willing to visit with father, Gian did not want to live with him or go to Los Angeles.  (See *Patrick S.*, *supra*, 218 Cal.App.4th at p. 1265 [the juvenile court may take into consideration the dependent child's wishes when considering placement, but it is not the deciding factor].)

Finally, the evidence indicated father had unstable housing.  It appears father did not secure housing until five months after the children's removal when he moved in with his mother in December 2020.  Additionally, father reported that when Gian and Alayasia were attending school in Los Angeles, they stopped attending school due to father's unstable housing situation and his inability to provide the school a physical address.

For these reasons, we conclude the juvenile court's finding that placement with father would be detrimental to the children was supported by substantial evidence from which a reasonable trier of fact could have found it highly probable that placement would be detrimental.  (See *O.B.*, *supra*, 9 Cal.5th at pp. 1005, 1011.)

13.

**DISPOSITION**

The juvenile court's order is affirmed.

MEEHAN, J.

WE CONCUR:

FRANSON, Acting P. J.

SNAUFFER, J.

14.